**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE: MATTHEW EDWARD SHKOR ) ) CORNERSTONE CAPITAL, LLC, ) )       Appellant, ) )       v. ) ) CAPITAL BANK, N.A., ) )       Appellee. ) | Case No. 23-cv-03648 (APM) On appeal from the United States Bankruptcy Court for the District of Columbia |

**MEMORANDUM OPINION**

**I.   INTRODUCTION**

In 2017, Matthew Shkor obtained two loans secured by liens on his property: the first from Capital Bank, N.A. ("Capital Bank"), and the second from Cornerstone Capital, LLC ("Cornerstone"). Capital Bank was first in lien priority. In early 2018, Capital Bank agreed to refinance Shkor's original loan, using the same property as security. As a putative condition of issuing a title policy for the new lien, Capital Bank's title insurer required that Cornerstone release its second priority lien, which would allow Capital Bank to retain first position. Unbeknownst to Capital Bank, Cornerstone never agreed to the release. Still, the settlement agent went through with the transaction, and Capital Bank received a title insurance policy with no reference to Cornerstone's lien. District of Columbia land records thereafter showed Cornerstone's lien as having moved into first position. Cornerstone initiated foreclosure proceedings on the property over two years later. Only then did Capital Bank realize that Cornerstone had not released its lien.

Shkor then filed for bankruptcy. Before the bankruptcy court, Capital Bank sought a declaration that its lien securing the refinanced loan is superior to Cornerstone's lien. The bankruptcy court found in Capital Bank's favor under the equitable doctrine of replacement of mortgages. It thus declared that Capital Bank holds the first priority lien on Shkor's property in the principal amount owed on the refinanced loan plus interest. Cornerstone's lien would occupy second position.

Cornerstone now appeals. It argues that the bankruptcy court erred because (1) District of Columbia law does not recognize the doctrine of replacement of mortgages, and (2) it incorrectly applied the doctrine to the undisputed facts. For the reasons that follow, the court disagrees and affirms.

## II.   BACKGROUND

### A.   Facts

In April 2017, Shkor purchased the property located at 1738 R Street, N.W., Washington, D.C. 20009 (the "Property") and entered into an agreement with Capital Bank to borrow $4,050,000, secured by a first-position deed of trust on the Property recorded on May 1, 2017. Bankr. Ct. Mem. Decision, ECF No. 3-10 [hereinafter Mem. Decision], at 1–2. The next month, Shkor borrowed $1,262,500 from Cornerstone, secured by a second-position deed of trust on the Property recorded on June 23, 2017. *Id.* at 2–3.

In early 2018, Shkor sought to refinance his loan with Capital Bank. *Id.* at 3–4. Capital Bank retained Standard Title Group, LLC ("Standard Title") as the settlement agent. *Id.* at 4. Standard Title, in turn, solicited an ALTA Commitment for Title Insurance from Old Republic National Title Insurance Company. *Id.* The title commitment required that Cornerstone's lien on

the Property be satisfied and/or released before completing the transaction. *Id.* Standard Title was responsible for ensuring this condition was met. *Id.* at 5.

Standard Title did not fulfill its obligation. Standard Title's agent, Kevin Anderson, never received written confirmation that Cornerstone released its lien. *Id.* at 5–6. Anderson claimed that one of Cornerstone's co-managers, Mark Schuman, orally committed to doing so in passing during a conversation, which Schuman denied. *Id.* at 6; Trial Tr. 2/7/23, Bankr. R. 89 [hereinafter Trial Tr.], at 60–62. The bankruptcy court credited Schuman's testimony over Anderson's. Mem. Decision at 10.

Shkor also emailed Schuman about the refinancing. He wrote to "request that [he] be allowed to complete [the] Capital [Bank] refi, 100% proceeds going to pay down the line, and pay the delta off from sales." *Id.* at 6 (second and third alterations in original). Shkor assured Schuman that Cornerstone would "still [be] significantly secured, and the line will be reduced by 400k so I think you would be confident in the position." *Id.* Cornerstone never accepted the offer. *Id.* at 7.

Nonetheless, Standard Title permitted the refinancing to move forward without notifying Capital Bank that Cornerstone had not released its lien. *Id.* Capital Bank did not attempt to independently verify the release, either. *Id.* at 5. Capital Bank thus believed it retained first position based on both the title commitment and the title insurance policy it received after closing, which did not except Cornerstone's lien from coverage. *Id.* at 4–5.[1]

After refinancing, Shkor's loan with Capital Bank was converted to a $2,000,000 home equity line of credit. *Id.* at 3. That loan was secured by a deed of trust on the Property recorded

---

[1] The bankruptcy court found that "all the relevant written evidence, except for the Closing Letter" Capital Bank sent to Standard Title "supports the conclusion that Capital Bank intended to be in first position after the 2018 Capital Bank Refinance." Mem. Decision at 5. The closing letter had directed Standard Title to "'assure [Capital Bank] of a *second* priority lien' on the Property" before completing the transaction. *Id.* (alteration in original) (emphasis added). Based on the testimony and evidence before it, the bankruptcy court concluded that the reference to second position in the closing letter was a scrivener's error, and that Capital Bank always intended to retain first position. *Id.* Cornerstone does not challenge this finding on appeal.

on April 24, 2018. *Id.* The new loan paid off the outstanding balance of the initial Capital Bank loan, resulting in the release of the original lien on the Property. *Id.* The transaction also generated an additional $394,948.58 in net proceeds, which Shkor assigned to Cornerstone, reducing the outstanding balance of that loan to $408,884.89. *Id.* The corresponding lien, however, remained on the Property. *Id.* at 3, 5. Having predated the lien securing the refinanced loan, District of Columbia land records showed Cornerstone's lien now with first priority. *Id.* at 4.

Relying on this new position, Cornerstone made additional loans to Shkor. *Id.* at 8–9. The new loans, which totaled $1,756,000, increased the total balance Shkor owed Cornerstone to $2,193,882.88. *Id.* at 8. In December 2020, Cornerstone initiated foreclosure proceedings on the Property to satisfy the outstanding debt. *Id.* at 9.

### B.    Procedural History

The foreclosure proceedings made Capital Bank aware that Cornerstone still retained its lien on the property. *Id.* Capital Bank quickly filed a complaint and motion for temporary restraining order in the D.C. Superior Court to prevent foreclosure. *Id.* The case was removed to the United States Bankruptcy Court for the District of Columbia when Shkor filed for bankruptcy. *Id.* Once the case was removed, Capital Bank withdrew its motion for temporary restraining order and filed an amended complaint seeking declaratory judgment on the relative priority of the parties' liens on the Property. *Id.* at 9, 11.

The parties filed cross-motions for summary judgment. *Id.* at 11. The bankruptcy court largely denied both motions. *Id.* It did, however, rule in favor of Capital Bank on a discrete legal question: it agreed, on a matter of first impression, that District of Columbia courts would recognize the equitable doctrine of replacement of mortgages. *Id.* at 11; *In re Shkor*, 644 B.R. 410, 417 (Bankr. D.D.C. 2022). That doctrine "allows a lender to retain its senior lien priority under

4

certain circumstances . . . where a lender refinances its own lien." *In re Shkor*, 644 B.R. at 416. To retain its priority under this doctrine, a lender must show that "(1) The party paid off and refinanced the original mortgage as part of the same transaction; (2) As part of the transaction a senior mortgage was released of record and replaced with a new mortgage of record; and (3) The change in the terms of the new mortgage was not materially prejudicial to the holder of a junior interest." Mem. Decision at 13 (citing Restatement (Third) of Prop.: Mortgages [hereinafter Restatement] § 7.3 (Am. L. Inst. 1997)).

After a two-day bench trial, the bankruptcy court found for Capital Bank. Although it found that Cornerstone had not agreed to release or subordinate its lien, *id.* at 12–13, it concluded that the doctrine of replacement of mortgages applied and recognized the priority of Capital Bank's lien over Cornerstone's, *id.* at 18. The bankruptcy court found it "clear and undisputed" that the refinance satisfied the first two elements of the test. *Id.* at 14. As part of the transaction, Capital Bank had its original loan paid off, released the original lien, and recorded a new lien to secure the refinanced mortgage. *Id.*

The bankruptcy court also found that the terms of the refinanced loan did not materially prejudice Cornerstone. As an initial matter, the bankruptcy court concluded that it must evaluate prejudice at the time of the transaction. *Id.* at 14–15. It accordingly did not consider Cornerstone's subsequent loans to Shkor, which Cornerstone says it made in reliance on its then-first position. *Id.* at 15. Instead, focusing on the terms of the refinance, the court found that none of them—the principal amount, the interest rate, the extension of time, or the change in the type of loan— materially prejudiced Cornerstone. *Id.* at 14–18. The court thus ruled that "Capital Bank is entitled to a first priority position on the Property in the amount of $1,583,473.95 plus 5 percent interest

under the doctrine of replacement of mortgages." *Id.* at 18. Cornerstone timely appealed. Not. of Appeal, ECF No. 1.[2]

## III. LEGAL STANDARD

The court reviews the bankruptcy court's legal conclusions de novo and its factual findings for clear error. *In re Carvalho*, 598 B.R. 356, 362–63 (D.D.C. 2019) (citing *In re Hope 7 Monroe St. Ltd.*, 743 F.3d 867, 873 (D.C. Cir. 2014)). The bankruptcy court's application of the doctrine of replacement of mortgages falls into the former category. *See In re Stevenson*, 789 F.3d 197, 200 (D.C. Cir. 2015) (reviewing the applicability of equitable subrogation, a similar doctrine, de novo).

## IV. DISCUSSION

Cornerstone primarily challenges both the bankruptcy court's recognition and application of the doctrine of replacement of mortgages. Cornerstone secondarily argues that, if the doctrine entitles Capital Bank to relief, the bankruptcy court did not properly limit the amount on which Capital Bank can collect interest. The court takes each argument in turn.

### A.   Doctrine of Replacement of Mortgages

#### 1.   Recognition

The court first addresses Cornerstone's argument that, under D.C. law, the bankruptcy court should not have recognized the doctrine of replacement of mortgages. *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007) (providing that state law governs the substance of claims in bankruptcy proceedings). Cornerstone points out that the doctrine is not codified and the D.C. Court of Appeals has yet to adopt it. Appellant Br., ECF No. 5 [hereinafter Appellant Br.], at 13–14. That is true. But the absence of controlling law did not

---

[2] The bankruptcy court also concluded that the doctrine of laches did not bar Capital Bank's claim. Mem. Decision at 19–21. Cornerstone does not appeal this determination.

prohibit the bankruptcy court from applying the doctrine. When presented with a matter of first impression, the bankruptcy court had to "reason by analogy from D.C. cases to predict how [the D.C. Court of Appeals] would decide the question in a case like this." *In re Stevenson*, 789 F.3d at 201–02 (internal quotation marks and citation omitted). It did so, and this court now does the same. For two reasons, the court concludes that the D.C. Court of Appeals would adopt the doctrine of replacement of mortgages.

*First*, for over a century, District of Columbia law has recognized a similar doctrine, the doctrine of equitable subrogation. *See E. Sav. Bank, FSB v. Pappas*, 829 A.2d 953, 957 (D.C. 2003) (citing *Taylor v. MacGreal*, 15 App. D.C. 32, 33 (1899)). The doctrine provides that, under certain circumstances, "one who pays the mortgage of another and takes a new mortgage as security will be subrogated to the rights of the first mortgagee as against any intervening lienholder." *Id.* (citation omitted). The doctrine is almost identical to the replacement of mortgages, except that, for equitable subrogation, the new mortgage is extended by a different lender rather than the same lender. The remedies granted by the two doctrines are "analogous"—for each, the refinancer retains the extinguished senior lien's priority—and the requirements for relief under each doctrine are "essentially similar." Restatement § 7.6, cmt. e; *accord Cap. Bank, N.A. v. Ganges Fin. Grp.*, No. 20-cv-01470 (ABJ), 2021 WL 6750743, at *4 (D.D.C. Mar. 31, 2021). Given their resemblance, the D.C. Court of Appeals likely would recognize the replacement of mortgages, too.

*Second*, the Restatement recognizes the replacement of mortgages, *see* Restatement § 7.3, and the D.C. Court of Appeals relies on the Restatement for guidance in this area of law, *see, e.g.*, *In re Stevenson*, 789 F.3d at 202; *E. Sav. Bank*, 829 A.2d at 959. Cornerstone responds that the Restatement is not binding, and that the section on the replacement of mortgages has not been

7

adopted by D.C. courts. Appellant Br. at 16. Again, Cornerstone is right, as far as its argument goes. But in answering a question of first impression, the court is tasked with predicting whether the D.C. Court of Appeals *would* recognize the doctrine. Its reliance on the Restatement in analogous contexts suggests it would follow the Restatement here as well, which means it would likely recognize the doctrine of replacement of mortgages.

Citing two cases from other jurisdictions, Cornerstone contends that the court should not apply the doctrine when D.C. has not yet adopted it. *See* Appellant Br. at 14. Both cases are distinguishable. In *Hamilton v. Pennsylvania Housing Finance Agency*, the district court declined to apply the doctrine because an intermediate state appellate court had "declared that it was not the law of Pennsylvania." 614 B.R. 48, 57–58 (E.D. Pa. 2020). Cornerstone has not identified any analogous authority from a D.C. court. The other case Cornerstone cites, *First National Bank of Layton v. Palmer*, appears to be more like this one, in that no state court had explicitly adopted or rejected the doctrine. 362 P.3d 904, 907 n.3 (Utah Ct. App. 2013). But there, because the doctrine "was not raised below by either party, nor ha[d] it been briefed on appeal," the court had no occasion to consider it in the first instance. *Id.* Instead, the court "decline[d] to address the rationale . . . or include it in [its] analysis" entirely. *Id.* Here, Capital Bank raised the issue before the bankruptcy court, so unlike the court in *Palmer*, this court cannot avoid the issue. As already explained, the court believes that the D.C. Court of Appeals would adopt the doctrine.

Notably, this court is not the first in this District to conclude that a mortgagee that refinances its own loan can in equity retain its original lien's priority under D.C. law. Although framed there as a claim for equitable subrogation, citing the portion of the Restatement that analogizes the replacement of mortgages to equitable subrogation, the court in *Capital Bank, N.A. v. Ganges Financial Group, LLC* concluded that the lender had stated a claim where it had paid

8

off its own prior loan. *See* 2021 WL 6750743, at *4 (first citing *Burgoon v. Lavezzo*, 92 F.2d 726, 730 (D.C. Cir. 1937); then citing Restatement § 7.6 cmt. e.). Cornerstone dismisses this case as unpublished and faults the bankruptcy court for relying on it for the same reason. Appellant Br. at 16. But that argument is not well taken. A federal trial court decision, whether published or not, is relevant only insofar as it has the power to persuade, *see Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (internal quotation marks and citation omitted)), and the court finds *Ganges Financial* instructive. While it stopped short of formally adopting the doctrine of replacement of mortgages, it held that D.C. law would permit a claim under the "analogous" doctrine of equitable subrogation where a lender refinanced its own loan. *Ganges*, 2021 WL 6750742, at *4 (quoting Restatement § 7.6 cmt. e.). *Ganges* thus supports the conclusion that D.C. law would allow the same claim under the doctrine of replacement of mortgages.

    2.    *Application*

Having concluded that the D.C. Court of Appeals would recognize the doctrine of replacement of mortgages, the court now turns to its application in this case. As relevant here, the doctrine provides that when

> a senior mortgage is released of record and, as part of the same transaction, is replaced with a new mortgage, the latter mortgage retains the same priority as its predecessor, except to the extent that any change in the terms of the mortgage or the obligation it secures is materially prejudicial to the holder of a junior interest in the real estate.

Restatement § 7.3(a)(1) (cleaned up). The bankruptcy court found that, as part of the refinancing transaction, Capital Bank released its original mortgage and replaced it with a new mortgage. Mem. Decision at 14. Cornerstone does not dispute these findings. The case accordingly turns on

9

whether "any change in the terms of the mortgage or the obligation it secures is materially prejudicial" to Cornerstone. Restatement § 7.3(a)(1).

The bankruptcy court found no such change. It considered the terms of the refinanced mortgage—including changes to the principal amount, interest rate, repayment timeline, and type of loan—and found that Cornerstone was not substantially prejudiced by any new term. Mem. Decision at 14–18; *see also E. Sav. Bank*, 829 A.2d at 959–60 (considering similar factors). Cornerstone does not challenge these findings on appeal.

Instead, Cornerstone takes issue with what the bankruptcy court did *not* consider. Cornerstone contends the bankruptcy court erred in evaluating prejudice only at the time at which the mortgage was refinanced and in failing to consider what Cornerstone refers to as "the total equities." Appellant Br. at 17–19, 22–23. More specifically, Cornerstone argues that the bankruptcy court should have considered (1) the absence of wrongdoing by Cornerstone and Capital Bank's "fault" in failing to verify whether Cornerstone had released its lien, and (2) the nearly $2 million in additional loans Cornerstone advanced to Shkor on the belief that its lien enjoyed first priority. *Id.* The court need not decide whether the bankruptcy court properly limited the scope of its analysis. The additional events on which Cornerstone relies do not compel a different result.

*First*, the bankruptcy court did consider whether Capital Bank was blameworthy for failing to independently verify whether Cornerstone had released its lien and held that it was not. Mem. Decision at 19.[3] It reasoned that, under D.C. law, Capital Bank had no "independent duty to review and confirm the completion of the transaction as reflected in the title policy." *Id.* (citing *Long v.*

---

[3] Admittedly, the bankruptcy court drew this conclusion in a different context: its rejection of Cornerstone's defense of laches. But laches is also an equitable doctrine, *see Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 47 (D.C. Cir. 2005), so the bankruptcy court's consideration of Capital Bank's fault (or lack thereof) is equally relevant to application of the doctrine of replacement of mortgages.

10

*Am. Sav. & Loan Ass'n*, 151 A.2d 770, 773 (D.C. 1959)).  Cornerstone does not meaningfully contest that legal determination.  Nor does it dispute the facts.  Capital Bank received a title commitment requiring that Cornerstone's lien be released and then an insurance policy after closing that did not except Cornerstone's lien from coverage, which reasonably led it to believe Cornerstone had released its lien.  Mem. Decision at 4–5, 19.  Capital Bank was not obligated to do more.  So, there was no "fault" to hold against Capital Bank.

Moreover, even if Capital Bank could be said to bear some responsibility for failing to verify that Cornerstone had released its lien, that would not change the analysis.  In *In re Stevenson*, the D.C. Circuit sustained a claim for equitable subrogation where the lender had *actual knowledge* that a junior lienholder had not released his interest in the property at the time of refinancing. *See* 789 F.3d at 200, 202.  The Restatement provides for the same result under either doctrine. *See* Restatement § 7.3 cmt. b; *id.* § 7.6 cmt. e.  If actual knowledge is insufficient to defeat a claim for subrogation, so too is ignorance due to neglect.  *See E. Sav. Bank*, 829 A.2d at 957 ("[N]either negligence nor constructive notice should be material." (citation omitted)); Restatement § 7.6 cmt. e illus. 23 (demonstrating that a mortgagee can be subrogated to the senior lien even where it does not perform a title examination).

Ultimately, the guiding question is "whether the payor reasonably expected to get security with a priority equal to the mortgage being paid."  Restatement § 7.6 cmt. e.  "Ordinarily lenders who provide refinancing desire and expect precisely that, even if they are aware of an intervening lien." *Id.*  So "[a] refinancing mortgagee should be found to lack such an expectation only where there is affirmative proof that the mortgagee intended to subordinate its mortgage to the intervening interest." *Id.*; *see also id.* § 7.3 cmt. b.  The bankruptcy court found that the record "supports the conclusion that Capital Bank intended to be in first position after the 2018 Capital

Bank Refinance." Mem. Decision at 5. Cornerstone presents no evidence to the contrary, and it does not contest that finding on appeal. The bankruptcy court therefore made no error in how it evaluated Capital Bank's actions.

*Second*, Cornerstone's extension of more debt to Shkor does not rise to material prejudice because Cornerstone made the additional loans with knowledge of Capital Bank's refinancing. *See* Mem. Decision at 6–7 (citing Shkor's emails to Schuman). Junior lienholders are not "protected against subrogation" where they have "actual knowledge that the payor's advances were used to pay the first mortgage." Restatement § 7.6 cmt. b. This is so even when, "from the appearance of the public records," it seems as though the junior lienholder has "a first lien on the property." *Id.* That is precisely the case here. Despite it appearing as though Cornerstone held a first-position lien after the refinance, Cornerstone knew that Capital Bank paid off its original mortgage as part of the refinance. Cornerstone also had no reason to believe that Capital Bank intended to subordinate its first-priority lien position after having extended to Shkor a new $2 million line of credit.

At bottom, what Cornerstone seeks to do is "take an advantage offered by an inadvertence or mistake." *Burgoon*, 92 F.2d at 732. As described above, Capital Bank lost its first position through no fault of its own. And Cornerstone has "no recognizable right to rise upon another's mistake." *Id.* Instead, "the only 'rights' of the junior lienor that can be said to be actually impaired are gambling 'rights' to profit by a purchaser's mistake." *Id.* at 733. Cornerstone chose to gamble: despite its knowledge of Capital Bank's refinance, it made additional loans hoping that a court would affirm its first-position lien. Cornerstone cannot now claim prejudice from having lost that bet.

To rule otherwise would provide Cornerstone with an "unwarranted and unjust windfall." Restatement § 7.6 cmt. a; *see also id.* § 7.3 cmt. b. If the court were to rule in Cornerstone's favor, "[t]he only advantage they have gained is through the money paid by the plaintiff . . . without any consideration whatever moving from them." *Burgoon*, 92 F.2d at 732. In fact, Cornerstone benefitted from the refinancing, receiving a nearly $400,000 paydown of its original loan. Mem. Decision at 3. Cornerstone's desired "result would thus be a substantial payment and increased priority without any consideration—a clear windfall" that the doctrine of replacement of mortgages is designed to avoid. *Id.* at 18 (citing *In re Stevenson*, 789 F.3d at 201).

Ultimately, Cornerstone's "position is not impaired when [it] is restored to [its] original position" behind the remaining balance of Capital Bank's original loan. *Burgoon*, 92 F.2d at 732. Cornerstone's ability to collect has not changed, even if the balance on which it is seeking to collect has increased, a circumstance of its own making. Cornerstone therefore is not materially prejudiced by the refinance.[4]

**B.    Interest**

Cornerstone argues in the alternative that, if Capital Bank is entitled to relief, it "should not be permitted to collect interest on account of its secured lien to the extent that such interest together with principle [sic] exceeds" the "subrogated amount (i.e., $1,583,473.95)." Appellant Br. at 24–25. But the Restatement provides that "[s]ubrogation should be granted only to the extent of the debt balance that would have existed if the interest rate had been unchanged." Restatement § 7.6 cmt. e. Previously, Capital Bank's lien would have secured the outstanding balance plus

---

[4] Capital Bank also urges the court to exclude the subsequent loans from its prejudice analysis because the future-advances provision pursuant to which Cornerstone made the loans is invalid. Appellee Br., ECF No. 6, at 33–34. Because Capital Bank did not raise this argument before the bankruptcy court, it did not preserve the argument for appeal. *See Murphy Exploration & Prod. Co. v. U.S. Dep't of Interior*, 270 F.3d 957, 958 (D.C. Cir. 2001). The court accordingly declines to address it.

13

interest. The amount for which Capital Bank now seeks subrogation is the amount of that outstanding balance plus interest at a lower rate. Mem. Decision 16–17. Because the lien now secures less than "the debt balance that would have existed if the interest rate been unchanged," Restatement § 7.6 cmt. e, the court will not disturb the bankruptcy court's judgment that "Capital Bank holds a valid and secured first priority lien on the Property in the principal amount of $1,583,473.95 at 5 percent interest per annum," J. Order, ECF No. 3-10, at 1.

## V.   CONCLUSION

For the foregoing reasons, the bankruptcy court's judgment is affirmed. A final Judgment accompanies this memorandum opinion.

Dated: December 3, 2025

Amit P. Mehta
United States District Judge